IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMIE M. HAMILTON, *on behalf of W.F.H., III* (minor child) | ) ) | Case No. 1:23-cv-02429 |
| | ) | JUDGE DAVID A. RUIZ |
| Plaintiff, | ) ) | |
| v. | ) ) | MAGISTRATE JUDGE REUBEN J. SHEPERD |
| | ) | |
| COMISSIONER OF SOCIAL SECURITY, | ) ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.  Introduction

Plaintiff, Jamie M. Hamilton ("Hamilton"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income ("SSI") on behalf of her minor child, W.F.H., III ("W.F.H."), under Title XVI of the Social Security Act. Hamilton raises two issues on review of the Administrative Law Judge's ("ALJ") decision:

1.   In assessing whether Claimant met or medically-equaled listed impairments, the ALJ failed to sufficiently explain why Claimant allegedly did not have marked limitations in the domain of Concentration, Persistence or Pace and the domain of Adapting or Managing Oneself.

2.   In assessing whether Claimant functionally equaled listed impairments, the ALJ failed to sufficiently explain why Claimant allegedly did not have marked limitations in the domain of Attending and Completing Tasks.

(ECF Doc. 8, p. 1).

This matter is before me pursuant to 42 U.S.C. 405(g), 1383(c)(3) and Local Rule 72.2(b).

Because the ALJ  applied proper legal standards and reached a decision supported by substantial

evidence, I recommend that the Commissioner's final decision denying Hamilton's application for SSI be affirmed

## II.    Procedural History

Hamilton applied for SSI benefits on behalf of her minor child, W.F.H., on October 4, 2019. (Tr. 81). The Agency denied the claim initially on February 19, 2020 (*id.*), and again at reconsideration on June 15, 2020 (Tr. 95). After an initial hearing on December 10, 2020 (Tr. 56-80) ALJ Jessica Hodgson issued a decision denying Hamilton's claim for benefits. (Tr. 103-16) The Appeals Council granted review and remanded the matter to an ALJ by Order dated April 6, 2022. (Tr. 117-19)

A second hearing was held on November 14, 2022, before ALJ William Leland. (Tr. 35-55). On December 2, 2022, ALJ Leland issued a decision again denying Hamilton's claim for benefits. (Tr.14-34). On November 1, 2023, the Appeals Council denied further review, thereby rendering ALJ Leland's decision the final decision of the Commissioner. (Tr. 1-6). Hamilton instituted this action on December 22, 2023, to obtain judicial review of the Commissioner's final decision.

## III.    Evidence

### A.    Personal Evidence

W.F.H. was born on November 4, 2009. (Tr. 18). Under Social Security regulations, he was a school-age child at the time the application was filed and at the time of the ALJ decision. (*Id.*).

### B.    Educational Evidence

School records indicate W.F.H. has been involved in special education throughout his entire academic career. On December 13, 2018, his updated Individualized Education Plan

("IEP") noted that he had begun receiving special education services in preschool, and qualified for school age special education services when he made the transition to kindergarten. (Tr. 271). The author of the IEP wrote that W.F.H. struggled to "mov[e] past things that trouble him," and that he requires "a lot of explanation and redirection in order to be successful at decision making in the classroom." (*Id.*).

On November 26, 2019, W.F.H.'s teacher, Ms. Nicole Esborn, completed a Teacher Questionnaire. (Tr. 260-66). Ms. Esborn reported that at age 10, W.F.H. was reading and writing at a first-grade level and was at a second-grade level for math. (Tr. 260). Ms. Esborn noted that he required extra attention in all content areas, and that his reading was so far behind it affected his learning in all content areas. (Tr. 261). Ms. Esborn further wrote that W.F.H. "exhibits the behaviors of a student with ADD. There are times when he struggles to stay on task mentally." (Tr. 262).

W.F.H.'s IEP was updated again on November 24, 2020. (Tr. 389). The IEP referenced that W.F.H. had been administered a Wechsler Intelligence Scale for Children Assessment and had received a Full-Scale IQ Score of 79, with working memory and processing scores in the below average range. (Tr. 391). A November 10, 2020 Test of Educational Achievement had shown his reading and writing skills to be in the "very low" category, while his math scores were in the "low" category. (Tr. 490). His teacher, Mrs. Summer Brainard, indicated that his levels of Listening Comprehension, Oral Expression, Reading Comprehension, Basic Reading Skills, Basic Writing Skills, Written Expression, Mathematics Computation, and Mathematics Reasoning were all in the "Very Limited" range. (Tr. 398). Mrs. Brainard further expressed concern about his inattention, impulsiveness, anxiousness, and withdrawal. (*Id.*). Mrs. Brainard also completed a Teacher's Checklist, in which she indicated W.F.H. seemed emotional,

insecure, and unhappy; that he required more one-on-one attention than other students of his age and gender; that he had poor organizational skills; and was distractible and tended to lose things; that he was fidgety and struggled with impulsiveness; that he avoided interacting with peers; and, that he was anxious and withdrawn, often leading to crying. (Tr. 496-502).

On November 16, 2021, the IEP was updated again, with a focus on reading, decoding, reading comprehension, writing conventions, and math calculations. (Tr. 1506). The IEP also established two behavioral goals: organizing his workspace and appropriate peer interactions. (*Id.*). District assessments indicated W.F.H. was reading at a pre-school level and performing math at a third-grade level. (Tr. 1510).

### C.    Medical Evidence

The record reflects that W.F.H. was seen by Erin M.L. Babbitt, Psy.D., for a neuropsychological examination in early 2019, with an assessment completed on February 4, 2019. (Tr. 570-83). Dr. Babbitt noted a history of autism spectrum disorder ("ASD"), Attention-Deficit/Hyperactivity Disorder ("ADHD"), and anxiety diagnoses, and assessed W.F.H. with intellectual ability in the average range, although he demonstrated some articulation problems and weakness in language tasks. (Tr. 570). Dr. Babbitt felt W.F.H. was benefitting from his ADHD medications. (*Id.*). She noted that W.F.H.'s reading skills fell significantly below expectations and that he met the criteria for dyslexia. (*Id.*). He also demonstrated Specific Learning Disabilities in writing and mathematics, and his disabilities were so severe that he would not progress with general classroom instruction. (*Id.*). Dr. Babbitt diagnosed W.F.H. with ASD; history of speech delay; ADHD; Specific Learning Disorders in reading (moderate to severe dyslexia), written expression and mathematics; Post-Traumatic Stress Disorder ("PTSD"); and depressive symptoms. (Tr. 571). Dr. Babbitt recommended that W.F.H.'s Special Education

category should be changed to "Autism Spectrum Disorder"; that he have daily pull-out specialized intervention; that tests, assignments, and texts be read to him aloud; that he be granted extended time for tests and assignments; that assignments be tailored to his skill level; that he receive clear, simple instructions; that his desk be cleared of everything except current task material; and that he continue treatment for ADHD, sleep issues, and social and functional skills. (Tr. 571-72).

The record further reflects a significant history of treatment and counseling for W.F.H. He was engaged in school-based counseling with Crossroads from at least November 7, 2018, at which time he was diagnosed with PTSD, ADHD, and ASD. (Tr. 709). W.F.H. met routinely with counselors from Crossroads through November 11, 2020. (Tr. 706-946, 961-1102). In various sessions W.F.H. confided incidents of self-harm (Tr. 744), difficulty showing self-control after he had been abused by his father (Tr. 748), difficulty with schoolwork and making friends (Tr. 796), and violent ideations toward the police, his father, or other students (Tr. 827, 890, 928, 943). He also reported anxiety about being away from his friends when the family moved, and about starting a new school year. (Tr. 1011, 1077).

### D.     Opinion Evidence

#### 1.     State Agency Reviewers

On February 18, 2020, state agency reviewing Psychologist Carl Tishler, Ph.D. and Louis Goorey, M.D. received and reviewed the record and opined that W.F.H. had a "marked" limitation for acquiring and using information, a "less than marked" limitation for attending and completing tasks, interacting and relating with others, and caring for yourself. (Tr. 89-94). They found no limitation in moving about and manipulating objects or in health and physical well-being. (*Id.*).On June 12, 2020, state agency psychologist Aracelis Rivera, Psy.D. and Elizabeth

Roseberry, M.D. opined that there were "less than marked" limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself. (Tr. 97). They found no limitation in moving about and manipulating objects or in health and physical well-being. (Tr. 99-100).

### ii.     Consultative Examination Report

W.F.H. was seen by a psychological consultative examiner, Natalie Whitlow, Ph.D., on January 29, 2020, when he was 10 years old. Dr. Whitlow asked W.F.H. what made him unique and what makes life difficult for him, and he reported that he had been abused by his father and that he gets confused about math. He also mentioned that he has ADHD and that he has a hard time listening to and following instructions. He struggles to control his emotions and has temper tantrums. He forgets things like his homework or his lunchbox. (Tr. 948). He reported having many friends, but that he also gets bullied and teased. He mentioned wanting to get revenge on those kids who tease him. (Tr. 948-49). W.F.H. stated that he has a hard time sleeping once his ADHD medications wear off, and that he has a hard time transitioning from one subject to another. (Tr. 949).

W.F.H. resided with his mother, Hamilton, who had been separated from his father for six years following several instances of physical abuse toward W.F.H. (*Id.*). Hamilton relayed that W.F.H. was in the fourth grade and received special education services in the form of an IEP. (Tr. 950). W.F.H. did not have any physical health conditions impairing his functioning. (*Id.*). W.F.H. was prescribed psychotropic medications that he felt were effective. (*Id.*). W.F.H.'s aunt reported he needed to be reminded "step-by-step" on how to attend to his hygiene. (*Id.*). Dr. Whitlow wrote that W.F.H. presented in an "interpersonally rigid manner" and he spoke in an

abrupt and robotic speech tone. (Tr. 952). She noted that W.F.H. was often off-task during the exam, but easily re-directed. (*Id.*).

Dr. Whitlow diagnosed W.F.H. with ADHD; ASD; Specific Learning Disorders in reading, written expression, and mathematics; and Unspecified Trauma and Stressor Related Disorder. (Tr. 954). She opined that he was limited in acquiring and using information, as evidenced by his Specific Learning Disorder diagnosis, and limited in attending to and completing tasks, as evidenced by his ADHD diagnosis. (Tr. 955-56). Dr. Whitlow did not identify debilitating limitations in interacting with others despite issues with anger management and impulse control. (Tr. 956). She saw no functional limitation in self-care compared to the functioning of typically developing children of the same age. (Tr. 955-56).

### E.    Hearing Testimony

At W.F.H.'s initial hearing, held on December 10, 2021, only Hamilton offered testimony. Hamilton testified that W.F.H. was 11 years old and in the fifth grade. (Tr. 59). Hamilton testified that his school year had been challenging as he had been struggling to find his way to his classes. (Tr. 67). He was being bullied and was only "selectively social". (*Id.*). He was being accommodated with extended time for all assignments. (*Id.*). W.F.H. had an IEP, but he was barely reading at a first-grade level. (Tr. 68).  He had dyslexia, and limited retention ability. (*Id.*). Hamilton testified that W.F.H. had struggled with written assignments. (Tr. 69). Due to anxiety, W.F.H. would have meltdowns any time he had to do an oral project. (*Id.*). Hamilton reported that W.F.H. had only two friends at school, and he would struggle adjusting to new teachers. (Tr. 69-70). He required significant assistance and redirection to complete homework assignments. (*Id.*). He struggled to understand concepts and required Hamilton to speak to him as though he were a preschooler. (Tr. 70). He also struggled to complete chores, requiring more

leading and prompting than her other children, and required extra supervision when putting on

his shoes, brushing his teeth, or taking his medication. (Tr. 72). He spent his time watching

YouTube, playing Pokémon Go or coloring by himself. (Tr. 73). He had some difficulty logging

on to an iPad as he does not understand passwords. (*Id.*). He will grow frustrated and hit or kick

himself or pull his own hair. (Tr. 73-74). He struggled to zip or button his own pants and needed

to be supervised when showering or bathing. (Tr. 74).

Hamilton testified that W.F.H.'s speech was improving to where he can be understood

99% of the time by people who know him well. (Tr. 75). He still had difficulty with his

expressive language, particularly in telling people what he wants or what he is thinking. (*Id.*). He

had a hard time talking to new people, which Hamilton speculated was due to his issues with

abandonment and attachment. (*Id.*). Hamilton testified that W.F.H.'s medications have helped

him focus better, but he still lacks the ability to attend to one task. Once he is distracted, he is

unable to get back on track. (Tr. 76). He continued to have issues with sleep. (Tr. 76-77).

After the first ALJ decision was remanded, Hamilton testified again at a hearing on

November 14, 2022. Hamilton testified that W.F.H. was residing with her and his two younger

siblings. (Tr. 41). She reported that W.F.H. was unable to shower independently, he needed help

brushing his teeth and hair, and he occasionally needed help with zippers or buttons. (Tr. 42).

W.F.H. was able to put his clothes in the laundry basket and would sometimes take the dog

outside along with his mother. (Tr. 43). He spent his time playing with Legos or coloring. (Tr.

44).  He also enjoyed helping in the kitchen. (*Id.*). He preferred to be by himself. (Tr. 46).

Hamilton testified that he had been placed in a segregated classroom that is small and

does not require him to transition between classes. (*Id.*). He was with the same teacher and

twelve kids throughout the day. (*Id.*). He did not respond to new people, only those he has

known. (Tr. 46-47). He did not have friends that he spent time with outside of school. (Tr. 47).

W.F.H. had an IEP, and his special accommodations included small group instruction, extended

time, directions and questions read aloud, and extra breaks. (*Id.*). Hamilton believed the

accommodations were helping, and he was now reading at the third-grade level. (Tr. 48). He

rarely had behavioral issues at school, though he would occasionally have a tantrum. (*Id.*). He

was rarely assigned homework, but when he was it was "an immense struggle to get him to do it

at home." (Tr. 49). Hamilton testified that his mental health was aggravated by any deviation

from his normal schedule. (Tr. 50). He required breaks every 20 minutes throughout the school

day. (Tr. 53).

**IV.    Standard for Disability**

To qualify for SSI benefits, "(a)n individual under the age of 18 shall be considered

disabled . . . if that individual has a medically determinable physical or mental impairment,

which results in marked and severe functional limitations, and which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. 1382c(a)(3)(C)(i). To qualify, a child recipient must also meet certain

income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequential process to evaluate children's

disability claims. 20 C.F.R. § 416.924(c). At Step One, a child must not be engaged in

"substantial gainful activity." 20 C.F.R. § 416.924(b). At Step Two, a child must suffer from a

"severe impairment." 20 C.F.R. § 416.924(c). At Step Three, disability will be found if a child

has an impairment, or combination of impairments, that meets, medically equals or functionally

equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

## V.    The ALJ's Decision

In his December 7, 2022, decision the ALJ made the following findings:

1.    The claimant was born on November 4, 2009. Therefore, he was a school-age child on October 4, 2019, the date application was filed, and is currently an adolescent.

2.    The claimant has not engaged in substantial gainful activity since October 4, 2019, the application date.

3.    The claimant has the following severe impairment: autism spectrum disorder; attention deficit hyperactivity disorder; dyslexia; specific learning disorder; posttraumatic stress disorder; mild sleep-disordered breathing; and insomnia.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

6.    The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since October 4,2019, the date the application was filed.

(Tr. 22-29). Based on the foregoing, the ALJ determined that W.F.H. had not been under a

disability, as defined in the Social Security Act, from October 4, 2019, through the date of the

decision. (Tr. 29).

## VI.    Law and Analysis

### A.    Standard of Review

The court's review is limited in determining whether substantial evidence supported the

ALJ's findings of fact and the ALJ correctly applied the appropriate legal standards. *See Elam v.*

*Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the

administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision").

Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate

to support a conclusion," *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405-06 (6th Cir. 2009)

(internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992) quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 68 (6th Cir. 1989); *see also Blakely*, 581 F. 3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) citing 42 U.S.C. 405(g). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Blakely,* 581 F.3d at 406.

The court must also determine whether the Commissioner applied proper legal standards. If not, the court must reverse the Commissioner's decision, unless the error was harmless. *See e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits and deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleisher v. Astrue,* 774

F Supp.2d 875, 877 (N.D. Ohio 2011) quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996).

### B.      Procedure for Evaluating Child Cases

A claimant bears the burden of proving that they suffer from a disability within the meaning of the Act. *See* 42 U.S.C. § 1383(c); 20 C.F.R. § 416.912(1). An individual under the age of eighteen is considered disabled if they have a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous twelve-month period. *See* 42 U.S.C § 1382c(a)(3)(A).

In evaluating a claim for benefits related to the disability of a child the ALJ must follow a three-step sequential evaluation process. *See* 20 C.F.R. § 416.924(a). First, the ALJ must determine whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). Next, the ALJ must determine whether the claimant has a medically determinable impairment that is severe. *See* 20 C.F.R. § 416.924(c). Finally, the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or medically equals the listings. *See* 20 C.F.R. § 416.924(d). If a severe impairment does not meet or medically equal a listing, the ALJ must determine whether it results in limitations that functionally equal a listing. *See* 20 C.F.R. § 416.926a.

An impairment or combination of impairments meets or medically equals a listing if the impairment(s) result in "marked" limitation in two of the listing severity domains of functioning or an "extreme" limitation in one of the listing severity domains of functioning. 20 C.F.R. Part 404, Subpart P, App'x 1, § 112.00(A)(2)(ii). The four listing severity domains of functioning include (1) understand, remember or apply information; (2) interact with others; (3) concentrate,

persist or maintain pace; and, (4) adapt or manage oneself. 20 C.F.R. Part 404, Subpart P, App'x 1, § 112.00(A)(2)(b).

An impairment or combination of impairments functionally equals a listed impairment if such impairment(s) results in "marked" limitations in two of the functional-equivalence domains of functioning or an "extreme" limitation in one of the functional-equivalence domains. *See* 20 C.F.R. § 416.926(a), (d). There are six functional-equivalence domains: (1) acquire and use information; (2) attend and complete tasks; (3) interact and relate with others; (4) move about and manipulate objects; (5) care for oneself; and (6) health and physical well-being. *See* 20 C.F.R. § 416.926a (a)-(b) A "marked" limitation is defined as one that "interferes seriously with [a claimant's] ability to independently initiate, sustain, or complete activities". 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation is defined as one that "interferes very seriously" with the ability to independently initiate, sustain, or complete activities. *See,* 20 C.F.R. § 416.92a(e)(3).

## VII.    Discussion

### A.    The ALJ sufficiently explained why he determined that W.F.H. did not have marked limitations in the domain of Concentration, Persistence and Pace and the domain of Adapting and Managing Oneself.

Hamilton argues that the ALJ did not sufficiently explain in his decision why he found only moderate limitations in the domain of concentration, persistence and pace and the domain of adapting or managing oneself. (ECF Doc. 8, pp. 12-17). Hamilton argues that the ALJ erred in his determination that W.F.H.'s impairments did not meet or medically equal a listing. (*Id.*). The ALJ found a marked limitation in the domain of understanding, remembering and applying information, but found only moderate limitations in the domain of concentration, persistence or pace, and in adapting or managing oneself. (*Id.* at p. 14-17). Hamilton contends that there is

13

insufficient explanation in the decision as to why there were only moderate limitations in these two domains, suggesting there were no mitigating factors that discussed that distinguish between moderate and marked limitations. (*Id.*). Hamilton further suggests that information from W.F.H.'s IEP, and from the opinion of Dr. Whitlow, are more consistent with marked limitations. (*Id.*).

This Court's review of the ALJ's determination on this front is, however, quite limited. *Pettit v. Comm'r of Soc. Sec.,* 2023 WL 3200582, at *1 (6th Cir. May 2, 2023). This Court must affirm the ALJ's conclusion unless the ALJ "failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). The substantial evidence standard is not demanding, as it simply requires more than a "mere scintilla" of evidence, asking whether there is "relevant evidence" in the administrative record that a "reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill,* 587 U.S. 97, 97 (2019), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). In deciding whether to affirm the Commissioner's decision, it is not necessary that this Court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999).

### 1.    Concentrate, Persist and Maintain Pace

The ability to concentrate, persist and maintain pace refers to the abilities to focus attention and stay on task at a sustained rate. 20 C.F.R. Part 404, Subpart P App'x 1, 112.00(E)(3). In discussing his findings in this domain, the ALJ addressed school records which showed that W.F.H. required prompting to remain on task and had a tendency to abandon problems or tasks he deemed too difficult. (Tr. 20). The ALJ also cited W.F.H.'s report to the

psychological consultative examiner that he found it hard to focus on directions and carry them out. (*Id.*). W.F.H. told the consultative examiner he had "lots of energy" and, "I have to handcuff myself to a chair or I will get up when I am not supposed to." (*Id.*). The ALJ also noted that treatment records showed that W.F.H. experienced a reduction in his hyperactivity symptoms with the use of medication. (*Id.*). On the basis of the above, the ALJ found a moderate limitation in W.F.H.'s ability to concentrate, persist and maintain pace in task completion. (*Id.*).

The ALJ further references W.F.H.'s ability to focus and maintain attention in the context of evaluating whether he functionally meets a listing. In discussing the second domain in that evaluation, attending and completing tasks, the ALJ considered a Teacher Questionnaire completed in November 2019. Here the teacher noted an:

> obvious problem with working at a reasonable pace and finishing his assignments on time, as well as a slight problem in other areas, such as focusing long enough to finish his tasks, sustaining attention during play in sports activity, organizing his belongings, completing class and homework assignments and avoiding careless mistakes on his work. She said he requires prompting to stay on task in the classroom.

(Tr. 24).

The ALJ further references an Evaluation Team Report from when the claimant was ten years old that determined that, compared to his peers, W.F.H. completed less work, failed to pay attention to details, and made careless mistakes. (*Id.*). The report noted he had difficulty maintaining attention during tasks and often failed to follow through on instructions, and his behavior was disruptive to other students. (*Id.*). The ALJ also noted that Hamilton had reported to W.F.H.'s provider, who prescribes medications for ADHD, that the medication helped him maintain focus and that his ADHD symptoms were controlled during the day. (*Id.*).

In evaluating the expert opinions, the ALJ noted that he found persuasive the opinions of the state agency medical and psychological providers, which found a "less than marked"

15

limitation in attending and completing tasks. The ALJ was persuaded because the "programmatic experts provided a rationale for their findings, citing evidence found in the record." (Tr. 28). The ALJ was, however, not fully persuaded by the state's psychological consultant's opinion, as she "did not provide an opinion regarding the degree of limitation the claimant experiences in these areas of functioning." (Tr. 29).

Hamilton argues that the ALJ did not specify whether the alleged reduction in hyperactivity symptoms owing to medication served to improve W.F.H.'s ability to concentrate, persist and maintain pace. (ECF Doc. 8, p. 16). Hamilton adds that while she has reported that medications have helped W.F.H. maintain focus and control his ADHD symptoms, she had not been specific about which symptoms were in fact being controlled. (*Id.*). Hamilton also cites her own hearing testimony where she explained that W.F.H. "can stand past more like 5, 10 minutes instead of like 30 seconds without the medication" and noted that he required reminders. (*Id.*).

The ALJ's evidentiary findings in support of his "moderate" finding for concentration, persistence, and maintaining pace are sufficiently articulated and meet the substantial evidence standard. He noted his reliance on the improvements in W.F.H.'s symptoms when taking his prescribed medications, and the opinions of the state agency experts whose opinions were firmly based on evidence in the record. He also referenced the responses in a Teacher's Questionnaire that led to a conclusion that the limitations in this area were reasonably assessed as "moderate."

Bearing in mind Hamilton's burden to prove that W.F.H. suffers from a disability within the meaning of the Act, I disagree with her contention that the ALJ decision does not adequately explain why he determined there to be a "moderate" limitation in this listing-severity domain. Accordingly, this argument is not well-taken.

### 2. Adapt or Manage Oneself

Hamilton's argument that the ALJ failed to sufficiently explain why W.F.H. does not have "marked" limitation in this listing-severity domain is also unpersuasive. The regulations illustrate adapting or managing oneself as referring to "the abilities to regulate emotions, control behavior and maintain well-being in age-appropriate activities and settings." 20 C.F.R. Part 404, Subpart B, App'x 1, 112.00(E)(4). Hamilton asserts that the ALJ did not sufficiently articulate why he found a "moderate" limitation in the domain, as opposed to "marked." (ECF Doc. 8, p. 13).

The ALJ's decision acknowledges Hamilton's report that W.F.H. has difficulty adapting to changes in routine, and also his teacher's report that he has difficulty tolerating frustration and, when he desires attention, he expects it to be provided immediately. (Tr. 20). The ALJ further notes that W.F.H. cries when he is frustrated, has a rigid thought process, and has difficulty being flexible with changes. (*Id.*). W.F.H. had reported during a psychological consultative examination that he had difficulty controlling his feelings of anger toward children who bully him. (*Id.*). The ALJ, in his discussion of Listing 112.15 "paragraph C" criteria, did note that W.F.H. has better than "marginal" functioning, describing his ability to attend and participate in classes at public school, and his ability, with prompting, to complete tasks, and to independently dress and feed himself. (*Id.*).

The ALJ further looked to Hamilton's hearing testimony to address this listing-severity domain. Hamilton had indicated that W.F.H. was "generally independent in self-care activities such as dressing and brushing his teeth" although he does require assistance with bathing and using buttons or zippers. (Tr. 22). Hamilton testified that W.F.H. is able to perform some household chores, including putting clothes in a laundry hamper and walking the dog. (*Id.*). He is

able to get along with Hamilton, and his siblings, and although he does not have close friends, he "gets along with his teachers, other authority figures, and other children in school." (*Id.*). Hamilton added that he has difficulty tolerating changes in his routine. (*Id.*).

The ALJ also discusses W.F.H.'s IEP, which notes the need for prompting to keep him on task in the classroom and describes several of his behaviors as "disruptive to other students." (Tr. 24). The ALJ refers to another assessment from a teacher in November 2019 that indicated he did not have any problems in the domain of interacting and relating with others. (Tr. 25). His most recent IEP described W.F.H. as respectful to adults and well-behaved in class. He gets along with peers and enjoys playing with them at recess, although he sometimes becomes agitated when interacting with peers and has difficulty finding appropriate ways to respond. (Tr. 25-26). His IEP also indicated W.F.H. has some difficulty expressing anger, frustration, or irritation with peers appropriately, he has not been disciplined at school for outbursts associated with being unable to manage his emotions. (Tr. 26).

The paragraphs above demonstrate that the ALJ thoroughly considered the evidence relevant to this listing-severity domain before arriving at the conclusion that there was a "moderate" limitation. His analysis included reference to several mitigating factors, including his ability to attend and participate in public school classes; his ability to complete tasks and independently dress and feed himself; his ability to perform some chores, including walking the dog; his ability to get along with family, teachers, authority and peers; and, the lack of a disciplinary history at school relating to outbursts related to his inability to manage his emotions. Although Hamilton cites other evidence that she contends supports a finding that W.F.H. has greater limitations than the ALJ determined, the Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner's. *Thomas v. Sec'y of Health & Hum. Servs.*, 812 F.2d

1408 (6th Cir. 1987). The ALJ provided ample support for his determination of a "moderate" limitation, and that determination must therefore be left undisturbed.

> **B.** **In assessing whether W.F.H. functionally equaled listed impairments, the ALJ sufficiently explained why W.F.H. did not have a "marked" limitation in the domain of Attending and Completing Tasks.**

Hamilton also argues that the ALJ erred in his determination that W.F.H.'s impairment did not functionally equal a listing. (ECF Doc. 8, pp. 17-19). The ALJ determined that W.F.H. had a marked limitation in acquiring and using information, with less than marked findings in attending and completing tasks; interacting and relating with others; ability to care for himself; and health and physical well-being. Hamilton argues the ALJ did not sufficiently explain why he did not find marked limitations in attending and completing tasks, and notes that the only mitigating factor tending toward less than marked was W.F.H.'s response to medication. (*Id.* at pp. 18-19). Despite any benefit gained from the medications, however, Hamilton contends it is still not apparent that W.F.H. was sufficiently similar to healthy children of his own age to support a less than marked finding. (*Id.* at p. 18). Hamilton admits the ALJ found the state agency opinions persuasive and supportive of a less than marked finding but did not provide sufficient explanation as to why he was so persuaded. (*Id.* at pp. 18-19).

In arguing that the ALJ failed to sufficiently explain why W.F.H. did not have a "marked" limitation in the domain of Attending and Completing Tasks. (ECF Doc. 8, p. 17), Hamilton cites to Social Security Rule 09-4p, which reads:

> In the domain of "Attending and completing tasks" we consider a child's ability to focus and maintain attention, and to begin, carry through and finish activities or tasks. We consider the child's ability to initiate and maintain attention, including the child's alertness and ability to focus on an activity or task despite distractions, and to perform tasks at an appropriate pace. We also consider the child's ability to change focus after completing a task and to avoid impulsive thinking and acting. Finally, we evaluate a child's ability to organize, plan ahead, prioritize completing tasks, and manage time.

Hamilton contends that the ALJ cites only evidence suggesting that W.F.H. was incapable of performing the tasks contemplated by the Social Security Rules for a healthy school age child, without providing any mitigating factors indicating he is capable of complete these activities. (*Id.* at p. 17-18)

The Commissioner responds that the ALJ compared evidence tending to support Hamilton's allegations of greater limitations with evidence that detracted from her contentions. (ECF Doc. 10, p. 21). The Commissioner argues that the ALJ provided adequate support for his finding of a "less than marked" limitation in this domain (*id.* at p. 24), and, based on the record as a whole, it cannot be said that the ALJ's finding was outside the zone of choice. (*Id.*).

The regulations state that a "marked" limitation exists when a person's "impairment(s) interfere with [their] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.92a(e)(2)(i). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'" (*Id.*). When making disability determinations, the ALJ must compare the whole child's functioning in all activities at home, school, and in their community to children of the same age without impairments. 20 C.F.R. § 416.91a(b). Pursuant to domain two – attending and completing tasks – a school-age child is expected to focus their attention, follow directions, complete schoolwork, organize school materials, avoid careless mistakes, and complete family chores. 20 C.F.R. § 416.926a(h)(2)(iv); *see also Williams-Dorsey v. Comm'r of Soc. Sec.*, 2024 WL 345035 at *6 (N.D. Ohio, July 18, 2024).

In the decision, the ALJ thoroughly examines the evidence he considered in this domain. He notes initially that a neuropsychological evaluation recommended several accommodations to help W.F.H. improve his focus including clearing his desk of everything other than his current work assignment. It was also suggested that he be allowed to do his work "in a quiet place away

from distractions and get help with setting up his environment with additional structure and organization." (Tr. 24). His December 2018 IEP noted that W.F.H. exhibits problems with distraction in a classroom setting, and he sometimes required redirection to be successful. (*Id.*). A Teacher Questionnaire completed in November 2019 indicated an obvious problem working at a reasonable pace and completing assignments on time, but only slight problems with focusing long enough to finish tasks, sustaining attention during play in sports activities, organizing his belongings, completing class and homework assignments, and avoiding careless mistakes. He required prompting to stay on task in the classroom. (*Id.*).

The ALJ discussed an Evaluation Team Report from when W.F.H. was 10 years old that reported that, compared to his peers, he completed less work, failed to pay attention to details, and often failed to follow through on instructions. (*Id.*). His teacher reported his behavior was disruptive to other students, and his most recent IEP describes attention and focus as one of the areas where he could most improve. (*Id.*).

Hamilton reported to his prescriber, Brian Postma, M.D., that W.F.H.'s medications helped him maintain focus throughout the day but appeared to wear off by the end of the day. (*Id.*). Dr. Postma added an additional medication to be taken at night, and at an examination in August 2021, Hamilton reported that while he is fidgety at night, W.F.H.'s symptoms were controlled during the day by the medications. (*Id.*). The ALJ noted that Hamilton testified that W.F.H. required some prompting to complete tasks at home and school but was able to independently dress and feed himself, and able to compete some chores at home, including putting clothes in the hamper and walking the dog. (Tr. 19, 22).

The ALJ found persuasive the opinions of the state agency psychological experts with regard to their "less than marked" finding in the domain of attending and completing tasks. In so

finding, the ALJ wrote, "these programmatic experts provided a rationale for their findings, citing evidence found in the record." (Tr. 28). The ALJ further noted the state agency experts' findings were consistent with other evidence, including W.F.H.'s most recent treatment records, Hamilton's testimony, and W.F.H.'s educational records. (*Id.*).

The ALJ cited evidence both supportive of and contradictory to Hamilton's arguments. While he noted that W.F.H. required accommodations to perform at school without being distracted, or distracting others, he also noted that medications were successfully managing his ADHD symptoms. The ALJ further added that W.F.H.'s teacher did not see any areas in the attending and completing tasks domain rising past the levels of a "slight" or "obvious" problem to the point of creating a "serious" problem. (Tr. 24). Therefore, the ALJ's finding that W.F.H. has a "less than marked" limitation in attending to and completing tasks is supported by substantial evidence. While Hamilton may have weighed the evidence differently, it is not for this Court to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Williams-Dorsey,* at *7, citing *Reynold v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th. Cir. 2011). Rather, because the ALJ cites to substantial evidence in support of his finding, this Court must defer, and accordingly, I cannot recommend remand on this basis.

## VIII. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Hamilton's application for SSI be affirmed.


Dated: October 2, 2024

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

*** 

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and

23

recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)